1  Alison Berry Wilkinson (SBN 135890)
   Berry | Wilkinson | Law Group
2  165 North Redwood Drive, Suite 206
   San Rafael, California
3  Telephone:    (415) 259.6638
   Facsimile:    (877) 259.3762
4  Email: alison@berrywilkinson.com

5  Attorneys for Defendant
   SCOTT THORNE
6

7

8                 UNITED STATES DISTRICT COURT

9          FOR THE NORTHERN DISTRICT OF CALIFORNIA

10

11 FERNANDO DEL VALLE,                    Case No. 4:17-cv-03611-JSW

12              Plaintiff,

13     vs.                                DECLARATION OF ALISON BERRY
                                          WILKINSON IN SUPPORT OF
14 COUNTY OF SONOMA, STEVE                DEFENDANT'S MOTION IN LIMINE NO. 3
   FREITAS, SCOTT THORNE, ANTHONY         TO PRECLUDE EVIDENCE RELATED TO
15 DIEHM, BEAU ZASTROW, and DOES 1-       PLAINTIFF'S EX-WIFE, KIRSTEN
   50, inclusive                          ROBERTS, AND TO PROHIBIT ASSERTION
16                                        OF THE MARITAL PRIVILEGE DURING
              Defendants.                 HER TESTIMONY
17

18                                        Pretrial Date: February 8, 2021
                                          Time:          2:00 p.m.
19                                        Courtroom:     Courtroom 5, 2nd Floor
                                                         1301 Clay Street, Oakland, CA
20
                                          Trial Date:    March 1, 2021
21

22 I, Alison Berry Wilkinson, declare as follows:

23        1.      I am an attorney at law licensed to practice in the State of California and in the

24 United States District Court for the Northern District of California.  I am the principal attorney at

25 the Berry Wilkinson Law Group, counsel for Defendant Scott Thorne herein.

26        2.      I make this declaration based on my own personal knowledge, and, if called to

27 testify, could, and would, testify competently to the matters contained herein.  As to those matters

28 herein stated on information and belief, I believe them to be true.

                                          1

3.      I make this declaration in support of Defendants' Motion in Limine No. 3 to preclude and limit certain evidence, testimony and argument concerning his former wife, Kirsten Roberts.

4.      During this litigation, Plaintiff's ex-wife has been referred to by three different names: Kirsten Del Valle, Kirsten Schepp, and Kirsten Roberts.  I am informed and believe that the name currently being used by Plaintiff's ex-wife is Kirsten Roberts.

5.      From this litigation and the sworn testimony and discovery provided, I am aware that on September 24, 2016, the date of the incident at issue in this litigation, Plaintiff Fernando Del Valle and Kirsten Roberts were husband and wife.

6.      I have also seen and reviewed the statements given by both Mr. Del Valle and Ms. Roberts to the Santa Rosa Police Department on October 10, 2016.  During their interviews, both were represented by Attorney Izaak Schwaiger during their interviews.  Attached hereto as Exhibits B and C are true and correct copies of document excerpts demonstrating Mr. Schwaiger's presence and role at the October 10, 2016 interviews.

7.      During that interview, Mr. Schwaiger appeared to represent Ms. Roberts' interests in connection with the events of September 24, 2016 that give rise to this litigation, including facilitating her providing evidentiary photographs to the detectives, and assisting Ms. Roberts with the request by the detectives for consent to search and photograph her home, and coordinated when that would be done.

8.      I am further informed and believe that Ms. Roberts understood Mr. Schwaiger to be her attorney during that proceeding, which related to the incident giving rise to this litigation.

9.      I am also informed and believe that Mr. Schwaiger either verbally told, or executed paperwork with, the Santa Rosa Police Department indicating that he was acting as the attorney for Ms. Roberts on October 10, 2016.

10.      I am familiar with, and have participated in, investigatory interviews conducted by the Santa Rosa Police Department related to uses of force by law enforcement officers.  From those experiences, I am aware the general practice of the Santa Rosa Police Department is to only permit an attorney to sit in on an interview if the attorney is representing the individual being interviewed.

//

DECLARATION OF ALISON BERRY WILKINSON ISO MOTION IN LIMINE NO. 3
*Del Valle v. County of Sonoma, et al., USDC Case No. 3:17-cv-03611*

11.     I have both read the transcripts and watched the video recordings of the interviews by the Santa Rosa Police Department on October 10, 2016, and am familiar with their content. From that review, I learned both Mr. Del Valle and Ms. Roberts described to the detectives details of the argument that resulted in the deputies arriving at their home and Mr. Del Valle being arrested. Mr. Schwaiger did not object to those questions on the basis of marital privilege.

12.     The content of the argument was also testified to by both Ms. Roberts and Mr. Del Valle during the criminal trial and during depositions.

13.     I was present when Mr. Del Valle and Ms. Roberts each testified during the criminal trial and have personal knowledge of their testimony. I have also reviewed the transcripts.

14.     Although I was not present during the depositions of either Mr. Del Valle or Ms. Roberts, I am familiar with the content of their testimony based on having reviewed both transcripts as well as watching the video recording of Mr. Del Valle's testimony.

15.     At the deposition of Mr. Del Valle, taken on November 1, 2018, Mr. Schwaiger permitted Plaintiff to testify about the details of events that occurred in his home leading up to the police arriving on September 14, 2016. He did not invoke the marital communication privilege.

16.     However, during the deposition of Ms. Roberts on October 22, 2018, Mr. Schwaiger objected to counsel for the County of Sonoma asking Ms. Roberts questions about what happened on September 24, 2016 prior to the deputies arriving, as well as numerous other matters, on the ground of marital privilege. But, thereafter, during his examination of Ms. Roberts, Plaintiff's counsel played the videos Plaintiff had taken of Ms. Roberts during the argument, which included audio that recorded parts of what was said. He also asked Ms. Roberts questions about what had transpired in the home prior to the deputies' arrival.

17.     I have seen the videos recorded by Mr. Del Valle of Ms. Roberts on September 24, 2016. Those videos record both audio and video of what occurred during the course of the argument inside their residence, and depict Ms. Roberts' naked, upset, and intoxicated. The videos appear to have been taken of Ms. Roberts while she was inside the hallway of her home, just outside the bathroom and a bedroom, when she was naked. Ms. Roberts testified the videos were taken just after she had showered.

18.    I am aware from Ms. Roberts' deposition that she did not consent to the video recordings made by Mr. Del Valle, and was unaware of their existence prior to her deposition. True and correct excerpts from Ms. Roberts' deposition transcript related to the argument and the videos are attached hereto as Exhibit D.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 8th day of January 2021, in San Rafael, California.

_____/s/ *Alison Berry Wilkinson*_____
ALISON BERRY WILKINSON

4

**EXHIBIT B**

SRPD Case#: 16-13965
Date: 10/20/2016
Time: 1050 hours
Location: Santa Rosa Police Department

1    INTERVIEW WITH KIRSTEN DELVALLE
2
3    SRPD VCI Detective:  Joseph Bjornstrom
4    SRPD VCI Detective: Greg Wojcik
5    Interviewed:   Kirsten Delvalle
6    Attorney:       Izaak Schwaiger
7    Attorney's Assistant: Chandra Valianti
8
9    Legend:
10   ****:    Unintelligible
11
12
13
14   Det. Bjornstrom:      So, is it Kirsten?
15
16   K. Delvalle:   Yes.
17





**EXHIBIT C**

SRPD Case#: 16-13965
Date: 10/20/2016
Time: 1200 hours
Location: Santa Rosa Police Department

1   INTERVIEW WITH FERNANDO DELVALLE
2
3   SRPD VCI Detective: Joseph Bjornstrom
4   SRPD VCI Detective: Greg Wojcik
5   Interviewed:  Fernando Delvalle
6   Attorney:    Izaak Schwaiger
7   Attorney's Assistant: Chandra Valianti
8
9   Legend:
10  ****:   Unintelligible
11
12  Det. Bjornstrom:      So again, my name's Joe Bjornstrom.  You can call me Joe.  Um...
13
14  Det. Wojcik:  Greg Wojcik.
15
16  F. Delvalle:   ****
17
18  Det. Bjornstrom:      Um, so we're violent crimes detectives for the Santa Rosa Police
19                         Department. Um, as you probably already know, you're here, um, to talk about an incident
20                         that happened at your house on September 24th.
21
22  F. Delvalle:   **** I gotta look at ****.
23
24  Det. Bjornstrom:      That's okay.  Um, and we're talking to you as, as the victim in this case,
25                         okay?  You're free to leave at any point.  You're free not to answer any questions you don't
26                         want to.  Um, we're here basically to get your side of what you experienced and saw and,
27                         you know, what happened that night.  I'll have you talk in as much detail as you can about
28                         what you remember, um, and about what happened, and I'll just kinda let you lay it out



**EXHIBIT D**

1          UNITED STATES DISTRICT COURT

2          NORTHERN DISTRICT OF CALIFORNIA

3                    ---o0o---

4

5   FERNANDO DEL VALLE,            )
                                   )
6             Plaintiff,           )
                                   )
7      vs.                         )      No. 17-CV-03611 JSW
                                   )
8   COUNTY OF SONOMA, et al.,      )
                                   )
9             Defendants.          )
   _____)

10

11                    -  -  -

12

13

14       DEPOSITION OF KIRSTEN MARIE SCHEPP

15

16             October 22, 2018

17

18

19

20

21

22

23   Reported by:        Kelly K. Lopez, CSR #7785

24

25

1                           APPEARANCES:

2

3     FOR THE DEFENDANTS:

4             Bluestone, Zunino & Hamilton
              Attorneys at Law
5             50 Old Courthouse Square, Suite 401
              Santa Rosa, CA  95404
6             By:  Marshall E. Bluestone, Esq.

7     FOR THE PLAINTIFF:

8             Izaak Schwaiger
              Attorney at Law
9             130 Petaluma Avenue, Suite 1A
              Sebastopol, CA  95472
10            and
              Scott Law Firm
11            1388 Sutter Street, Suite 715
              San Francisco, CA  94109
12            By:  John Houston Scott, Esq.

13    ALSO PRESENT:

14            Monica Schupbach
              Fernando Del Valle
15

16

17

18

19

20

21

22

23

24

25

KELLY K. LOPEZ REPORTING * (707) 322-7757
KELLY@LOPEZREPORTING.COM

1                          I-N-D-E-X

2

EXAMINATION BY:                                    PAGE:

3
Mr. Bluestone                                   4, 114
4    Mr. Schwaiger                                    69

5

6
EXHIBITS                                           PAGE:
7
Exhibit A - Petition for Dissolution            41

8
Exhibit B - Diagram of Ms. Schepp's apartment   58
9
Exhibit 1 - Disc                                106
10
Exhibit 2 - Disc                                106
11
Exhibit 3 - Disc                                106
12
Exhibit 4 - Disc                                106
13
Exhibit 5 - Disc                                106
14
Exhibit 6 - Disc                                106
15

16

17

18

19

20

21

22

23

24

25

KELLY K. LOPEZ REPORTING * (707) 322-7757
KELLY@LOPEZREPORTING.COM

```
 1          At the offices of Bluestone, Zunino & Hamilton,

 2   Attorneys at Law, 50 Old Courthouse Square, Suite 401,

 3   Santa Rosa, California, on Monday, the 22nd day of

 4   October, 2018, commencing at the hour of 9:04 a.m.,

 5   thereof, before Kelly K. Lopez, CSR, State of

 6   California, personally appeared

 7                     KIRSTEN MARIE SCHEPP,

 8   who, having been first duly sworn, testified as

 9   follows:

10                        -  -  -

11   EXAMINATION BY MR. BLUESTONE:

12       Q.   Could you please state your name for the

13   record.

14       A.   Kirsten Marie Schepp.

15       Q.   Ms. Schepp, I know you've given testimony in

16   a previous matter before.  Have you ever had your

17   deposition taken?

18       A.   No.

19       Q.   Okay.  Let me go over some of just the ground

20   rules of a deposition.

21            First of all, you understand you've just

22   taken an oath to tell the truth, just as if you had

23   testified in court?  Do you understand that?

24       A.   Yes.

25       Q.   Also, during the deposition the court
```

```
 1        A.    Yeah, is my best guess.  Yeah.
 2        Q.    And when were you married?
 3        A.    May 2nd.  Actually, we got married in 2014,
 4   so we would have met in 2013.
 5        Q.    Okay.  So May 2nd, 2014?
 6        A.    Correct.
 7        Q.    And I know that you filed a petition for
 8   dissolution.
 9        A.    Yes.
10        Q.    And has that been completed yet?
11        A.    No.
12        Q.    Now, at the Highland address, who else lived
13   there?
14        A.    My son.
15        Q.    And what was his name?
16        A.    Jacob.
17        Q.    How old is Jacob?
18        A.    He's 14.
19        Q.    And how long did he -- I mean, did he stay
20   there -- you had a sharing arrangement?
21        A.    Yes.
22        Q.    And how often did he stay there?
23        A.    He's with me about half the time, maybe a
24   little bit more.  We have rotating -- I have a schedule
25   with his dad.  So he spends some days of the week with
```

1    were causing it to have problems?

2        A.    There was a lot of arguing about the same

3    thing over and over again, over things that could not

4    be fixed; happened in the past, before the

5    relationship; a lot of judgments being put, from my

6    perspective, on me, for things that I had done prior to

7    the relationship.  And I just -- you know, there was

8    buttons that were pushed in these situations.  So when

9    an argument would flare up, the target immediately went

10   to these topics that would generate a response.

11       Q.    And this is buttons that you felt he was

12   pushing on you?

13       A.    Yes.

14       Q.    And were there other sources of the flare-up

15   of these arguments, other than -- it sounds like -- and

16   correct me if I'm wrong -- that the argument would get

17   started and then he would go to these buttons --

18       A.    Yes.

19       Q.    -- to flare up the argument?

20       A.    Exactly.

21       Q.    And what were the difficulties in the

22   relationship?

23            MR. SCHWAIGER:  Objection.  Privilege.

24   You're talking about the contents of these arguments?

25            MR. BLUESTONE:  I'm talking about what were

```
1     the problems in the relationship.
2              MR. SCHWAIGER:  And so I'm going to again
3     assert the privilege.
4     BY MR. BLUESTONE:
5         Q.   Was there any financial issues --
6         A.   Yes.
7         Q.   -- that were problems in the relationship?
8         A.   Yes.
9         Q.   Can you describe what those were?
10        A.   I was the main provider for the household,
11    and Fernando was not interested in working anything
12    more than a part-time job.  He would not -- he felt
13    that he was entitled to free rent.  And he told me
14    that.
15             MR. SCHWAIGER:  So I'm going to move to
16    strike and renew the objection.  All of that is
17    obviously privileged communication.
18             MR. BLUESTONE:  Not the entire answer, but I
19    understand your objection to it.
20    BY MR. BLUESTONE:
21        Q.   So he was only working part-time?
22        A.   Yes.
23        Q.   And how many hours a week would that be?
24        A.   Maybe 20.
25        Q.   And what kind of financial stress did this
```

```
 1   put on the marriage?
 2       A.   Like I said, I was the -- I was the one
 3   responsible for covering all of the household expenses.
 4       Q.   And what other issues or problems in the
 5   marriage?
 6       A.   There were several.  I felt some of his
 7   relationships were inappropriate.  He did not like my
 8   family or my son or my friends or my job.
 9           MR. SCHWAIGER:  Object.  Privilege.  Move to
10   strike.
11   BY MR. BLUESTONE:
12       Q.   And what do you mean by "inappropriate
13   relationships"?
14       A.   Just conversations that he would have with
15   other women, I felt were inappropriate for -- coming
16   from a man who was in a committed relationship.
17       Q.   Any other issues that were affecting the
18   marriage?
19       A.   Several, yes.  I mean, that was the main --
20   we just didn't see eye to eye on most things.
21       Q.   After the second time that you had called the
22   police and they came and took him to get some mental
23   health counseling, were you involved at all in -- were
24   you aware that he sought mental health counseling after
25   that?
```

1              Oh, well, sorry.  After this incident, I did
2    contact law enforcement regarding Mr. Del Valle.  It
3    was post this incident that we're here for.
4         Q.    Okay.  And what was that?
5         A.    He had posted some pictures of me on Twitter,
6    some intimate pictures of me.
7         Q.    And you contacted them?
8         A.    Yes.
9         Q.    Did you contact Mr. Del Valle regarding
10   those?
11        A.    No.
12        Q.    Even by text message or anything?
13        A.    I might have tried to reach out.  I tried to
14   call everyone I could think of to get those pictures
15   taken down.
16        Q.    Were they taken down?
17        A.    Yes, eventually.  They were -- new ones were
18   put up and then -- so this incident happened twice.
19   The first time I tried to get them taken down, worked
20   with Mr. Schwaiger on getting them taken down.  Then
21   they were -- new pictures were posted sometime later.
22   And at that point is when I called the police.
23        Q.    What happened?
24        A.    I also spoke with Mr. Schwaiger.  I filed a
25   report.  Unfortunately, the -- they decided not to

```
1        A.    So it would be April 2017.

2              MR. BLUESTONE:  I have what I'll mark as

3    Exhibit A.

4              (Deposition Exhibit A marked for

5               identification.)

6    BY MR. BLUESTONE:

7        Q.    This is the petition you filed for

8    dissolution of your marriage?

9        A.    Yes.

10       Q.    And I just want to draw your attention under

11   paragraph 3.  It says the "Date of Separation."  Do you

12   see that?

13       A.    Yes.

14       Q.    And that's November 24th, 2016?

15       A.    Yes.

16       Q.    And why is that date put down for you?

17       A.    That is the date when I told him I wanted a

18   divorce and I wanted him to leave my house.  He didn't

19   actually leave until April.

20       Q.    Did he live continuously with you between

21   November 24th, 2016 and April 2017?

22       A.    Yes.

23       Q.    And what changed in April 2017 to make him

24   move out?

25       A.    I don't really know.  I found out he was in a
```

1  would get home probably -- it would get late; midnight,

2  sometimes, when he would get home.  But I would be,

3  most of the time, awake when he got there.  And I, of

4  course, got up earlier than him because I have, you

5  know, my job in the morning.  And then he would be at

6  home until whenever his scheduled time to go in in the

7  afternoon was.

8      Q.   Did Mr. Del Valle ever have any recurring

9  headaches prior to the incident, that you're aware of?

10         MR. SCHWAIGER:  Object.  Privilege.

11         THE WITNESS:  Not that I can remember being,

12  you know, a consistent complaint.

13  BY MR. BLUESTONE:

14     Q.   Now, on the day of the incident -- and I'm

15  not going to go through everything that you've already

16  testified in the other trial, but you had mentioned the

17  fact that you had died your hair or bleached your hair

18  out blond?

19     A.   Mm-hmm.

20     Q.   And that was something that was a big change

21  for you, correct?

22     A.   Yes.

23     Q.   Can you explain the evolution of why that

24  occurred?

25     A.   Well, Fernando was really specific about the

1  way he wanted me to look and dress.  So I had been --

2  he had requested that I bleach my hair blond.  And it

3  was not something that I had wanted to do to begin

4  with, but he was persistent about wanting that.  He

5  even spoke with my hairdresser about it.  Finally, I

6  just decided to do it, and so I did.

7      Q.    And when you came home from the

8  hairdresser's, was Mr. Del Valle already home?

9      A.    Yes.

10     Q.    And when you walked in the door, what

11 happened?

12     A.    Nothing.

13     Q.    And is this part of the reason that

14 instigated the argument that night?

15     A.    Yes.

16     Q.    Okay.  Was there any other reason that this

17 argument started?

18     A.    Well, I had come home after doing this thing

19 that he requested me to do, spent a bunch of money and

20 time at the salon, came home with this big change.  And

21 I walk in the door, and he couldn't even look up from

22 what he was doing to say hello or acknowledge me

23 walking through the door.  And that hurt, because I

24 didn't even want -- the whole bleaching my hair was not

25 my idea, not what I wanted to do.  I don't like

KELLY K. LOPEZ REPORTING * (707) 322-7757
KELLY@LOPEZREPORTING.COM

1   spending that kind of money, you know.  So it was just

2   kind of -- to me, it felt very -- it was an intentional

3   way of kind of hurting me.  He knew that by him not

4   acknowledging what I had done, that it would hurt me.

5        Q.   Had you had issues in the previous days prior

6   to that?

7        A.   Yes.

8        Q.   And what was happening in the relationship?

9        A.    All kinds.  I mean, there was stonewalling,

10  just arguments over everything.  I can't say

11  specifically, but it was not -- it was a bad time in

12  those couple weeks leading up to this incident.

13       Q.   During that argument that you had that night,

14  did Mr. Del Valle get angry?

15       A.   Yes.

16       Q.   Did he raise his voice to you?

17       A.   I don't recall.

18       Q.   And how do you know that he was angry?

19            MR. SCHWAIGER:  Object.  Privilege.

20            THE WITNESS:  It wasn't a one-sided argument.

21  We were arguing together, so I knew that he was angry.

22  BY MR. BLUESTONE:

23       Q.   And what are the things that you were arguing

24  about?

25       A.   That night --

48

1          MR. SCHWAIGER:  Object.  Privilege.

2          MR. BLUESTONE:  So the subject matter of the

3   lawsuit, you're objecting to?

4          MR. SCHWAIGER:  What they were arguing about

5   is not the subject matter of the lawsuit, as far as I

6   know.  You're asking the content of a privileged

7   conversation.  And if any marital communications should

8   be deemed confidential, it would be one that a couple

9   are having in their own home privately; however, once

10  other third parties are involved in that or could

11  overhear that, then that becomes a different issue.

12  But right now, as the question stands, it invades the

13  privilege.

14  BY MR. BLUESTONE:

15     Q.    Well, do you have any understanding of

16  whether or not your neighbors could hear you and

17  Mr. Del Valle arguing?

18     A.    At the time, no.  I mean, sound carries in

19  that neighborhood, so I assume that they could probably

20  hear what was going on, especially the people who live

21  downstairs.  But, honestly, it wasn't something that I

22  was thinking about during the argument.

23     Q.    And so what were you two arguing about?

24          MR. BLUESTONE:  I mean, didn't we just

25  establish your exception?

```
1              MR. SCHWAIGER:  I don't think so, but if you
2    want to talk about what could other people overhear --
3    I don't know, Marshall.  I'm going to assert the
4    privilege.
5              Go ahead and answer the question.  I'll
6    object and make a motion to strike based on the answer.
7    How about that?  Because I think some of this is fair
8    game.  And I don't just want to be an obstacle here.
9    So if I think the answer is objectionable after I've
10   lodged my objection on privilege, I will make a motion
11   to strike; if not, it will stand.
12   BY MR. BLUESTONE:
13      Q.   Go ahead and tell me what you were arguing
14   about.
15      A.   I can't remember specific details, but I know
16   the finances probably came up.  Those buttons got
17   pushed again.  It just -- yeah, I mean, it gets to the
18   point where I'm just, you know, having to defend myself
19   for things that are not even relevant to the argument.
20   And that's how it ended up getting out of hand, was
21   that things besides what should have been discussed or
22   argued about, it's like the Pandora's box gets opened
23   every time.  And anything that's in there is fair game.
24      Q.   And I take it you were very upset that night?
25      A.   Yes.
```

1    Q.    During that argument, it sounds like you were
2    arguing about finances and a whole host of things.
3    A.    Yes.
4    Q.    At any time during that night, did
5    Mr. Del Valle strike you?
6    A.    No.  He did -- he did smack several wine
7    glasses out of my hand.  So he did hit the glass out of
8    my hand.
9    Q.    Okay.
10   A.    That would be the closest thing, I believe,
11   considered as anything like that.
12   Q.    But you didn't consent to that, correct?
13   A.    No.
14   Q.    And did the wine get --
15   A.    Everywhere, yeah.
16   Q.    Did it also get on top of you?
17   A.    Yes.
18   Q.    How many times did he do that that night?
19   A.    At least two, but I can't say that it wasn't
20   more than that.
21   Q.    Prior to that night, had he physically
22   assaulted you?
23   A.    Yes.
24   Q.    And what types of things did he do to
25   physically assault you?

1    marriage?

2            MR. SCHWAIGER:  Object.  Privilege.

3            THE WITNESS:  I wouldn't say that the

4    garnishments and the child support were an issue in the

5    relationship.  I understand child support.  I receive

6    it from my son's father.

7    BY MR. BLUESTONE:

8        Q.   Did it have a secondary effect of not giving

9    him finances to help in your marriage?

10       A.   I suppose.

11       Q.   But that part of it was never an issue for

12   you?

13       A.   The child support?  No, not at all.

14       Q.   Just in general, the finances?

15       A.   Yes.

16       Q.   Now, when the deputies or the sheriff showed

17   up on the date of the incident in September 2016, when

18   did you first become aware that there were sheriff

19   deputies?

20       A.   When they knocked on the door.

21       Q.   And was it a quiet knock?

22       A.   No.

23       Q.   And did you go back and talk to Mr. Del Valle

24   regarding the presence of deputies at the front door?

25       A.   I walked down the hall.  He was in the back

1    room with the door closed.  And I said, "The cops are

2    here."

3        Q.    Was there any doubt in your mind that anyone

4    in the house could hear the knocking on the front door?

5        A.    No doubt whatsoever.

6        Q.    Did you say it loud enough through the door,

7    that the cops were here, that you were confident that

8    he could hear you inside?

9        A.    I felt like he could hear me inside.  I got

10   close enough to the door.  I wasn't right against the

11   door.  But if he was in there, he should have been able

12   to hear me.

13       Q.    And the deputies were knocking on the front

14   door for a period of time?

15       A.    Yes.

16       Q.    And what were you doing during that period of

17   time?

18       A.    I had taken a shower to wash the wine off of

19   me.  And when I heard the knocking on the door, I

20   needed to put some clothes on so that I could answer

21   the door.

22            MR. BLUESTONE:  Let me mark this as the next

23   exhibit in order.

24            (Deposition Exhibit B marked for

25              identification.)

1    this case.  And I'm respecting your objection at this

2    point in time, but I'm reserving right to go forward

3    with this information upon a meet-and-confer or further

4    court order.

5    BY MR. BLUESTONE:

6        Q.    I see that you actually ended up filing

7    for divorce -- if I look on Exhibit A -- on

8    March 24th, 2017?

9        A.    Correct.

10        Q.    And then you had told me that in April he had

11    moved out?

12        A.    Yes.

13        Q.    On the night of the incident, after -- at

14    some point you came out of the master bedroom and were

15    in the hallway for a period of time, correct?

16        A.    During the incident?

17        Q.    Yes.

18        A.    Yes.

19        Q.    And then you came back into the master

20    bedroom, correct?

21        A.    Yes.

22        Q.    And after you went back in the master

23    bedroom, you never saw Mr. Del Valle that night?

24        A.    Correct.

25        Q.    Okay.  And when's the next time you saw him?

1    A.    Yes.

2    Q.    Do you know how that occurred?

3    A.    I didn't see that happen.  I'm assuming it

4    happened while I was in the shower.  But that is

5    something that Fernando did when he was angry with me.

6    He would go into my son's room and tear it up, flip the

7    bed, flip the furniture, that kind of stuff.

8    Q.    And to the best of your knowledge, it wasn't

9    like that before you went in the shower?

10    A.    Correct.

11    Q.    Does it upset you when he does that?

12    A.    Yes.  He would do things -- he would tear up

13    my son's room, rip up pictures of my son when he was

14    upset with me.

15    Q.    This is one of those buttons?

16    A.    Yes.

17    Q.    In the north -- what's labeled the "Northwest

18    Bedroom," did anybody stay in there?  Was that a guest

19    bedroom?

20    A.    That was for Sophie, when she would come up.

21    I had set up a bedroom for her that she could have of

22    her own, when she came up to stay with us.

23    Q.    After the incident, let's say a month after

24    the incident, was Mr. Del Valle complaining about

25    anything related to the incident, in terms of physical?

 1   directly about the incident.  And I assume that that

 2   would be subject to a waiver.

 3          MR. SCHWAIGER:  No, not if it's just a

 4   husband-and-wife communication or if an attorney was

 5   present.

 6          MR. BLUESTONE:  I mean, you're not waiving

 7   it.  I'm sorry.  I said that backwards.

 8          MR. SCHWAIGER:  Yes, that would be subject to

 9   waiver.  Thank you.

10   BY MR. BLUESTONE:

11      Q.   Okay.  Other than discussing the events that

12   happened on that day with Mr. Del Valle with just you

13   two present, did you ever discuss the events that

14   happened on the incident we're here for with

15   Mr. Del Valle and with a third party present?

16      A.   No.

17          MR. BLUESTONE:  I have no further questions

18   at this time.

19   EXAMINATION BY MR. SCHWAIGER:

20      Q.   All right.  Ms. Schepp, we met each other

21   before, fairly close in time, I think, to these events

22   happening.  And I understand that your relationship

23   with Fernando has changed and that you don't get along.

24   And I appreciate that.  And that's why you are getting

25   a divorce.  I've been divorced a couple times myself,

```
1        A.    Yes.

2        Q.    Isn't it true that you actually took a shower

3   because you had defecated on yourself after drinking

4   too much?

5        A.    Oh, my God.  That's disgusting.  No.

6        Q.    That's not true?

7        A.    At all.

8        Q.    Okay.  How intoxicated were you that evening?

9        A.    I couldn't tell you.

10       Q.    Why not?

11       A.    Because I wasn't counting.  And, honestly,

12  because several glasses of wine had been slapped out of

13  my hand that, honestly, I have no idea.

14       Q.    Well, were you intoxicated?

15       A.    Maybe a little.

16       Q.    A little?

17       A.    Mm-hmm.

18       Q.    Okay.  Were you being abusive to Fernando?

19       A.    No.

20       Q.    Now --

21       A.    Physically, no.  I may have said some things

22  that I should not have said or that were mean or, you

23  know, very mean.

24       Q.    Like what?

25       A.    I don't remember specifically.
```

85

1     Q.    Generally?

2     A.    I couldn't tell you.

3     Q.    Then what makes you say that you were saying

4  some things that were very mean?

5     A.    Because I can be mean.  If I am feeling

6  threatened, if I am feeling that I have no other

7  recourse, and I'm being attacked, I can say things that

8  are mean.

9     Q.    Okay.  What about getting physically

10  aggressive?

11     A.    No.

12     Q.    You've never been physically aggressive with

13  Fernando?

14     A.    I've never struck, hit, nothing like that.

15     Q.    Did you ever get in his face?

16     A.    Yes.

17     Q.    Did you ever push him?

18     A.    No.

19     Q.    Have you spoken with any investigators, other

20  than law enforcement, in relationship to this case?

21     A.    No.

22     Q.    Have you spoken with any attorneys, other

23  than me, in relationship to this case?

24     A.    No.

25     Q.    Have you reviewed any materials in

```
 1        Q.    Yeah.
 2              MR. BLUESTONE:  Objection.  Vague.  Are you
 3   talking about people or issues?
 4   BY MR. SCHWAIGER:
 5        Q.    The toxic environment.
 6        A.    What parts were not?  I feel like it was very
 7   reactionary.  I feel like I was reacting to things that
 8   were done and said to me.
 9        Q.    And on that evening, though, when he was
10   closed in the bedroom and you were yelling at him for
11   an hour and saying mean and hurtful things, that was
12   you reacting to him as well?
13        A.    Yes.
14        Q.    Is he the one that's responsible for that or
15   are you?
16        A.    I'm responsible for my own behavior.
17   Fernando is responsible for his own.
18        Q.    Okay.  At some point the back room wasn't
19   locked, correct, where Fernando was?
20        A.    I don't know.
21        Q.    Did you go into the bedroom at some point
22   where Fernando was?
23        A.    Maybe.
24        Q.    Did you get in his face?
25        A.    I might have.
```

```
 1   take that off the table, if you will consider replacing

 2   it later.  But if you're going to mark them, you're

 3   going to mark them.

 4           MR. SCHWAIGER:  Let's pass these down.

 5           (Deposition Exhibits 1 through 6 marked for

 6              identification.)

 7           MR. SCHWAIGER:  All right.  So we are on the

 8   record, to the extent we weren't before.

 9   BY MR. SCHWAIGER:

10      Q.   All right.  Ms. Schepp, I am going to show

11   you videos which I believe to have been taken the

12   evening in question.  They're personal, and they're

13   embarrassing.  There's no way around that.  And I do

14   apologize.  It's not my intention to embarrass you

15   today.

16           I am going to play these videos.  I am going

17   to have you listen to them.  I'm going to tilt my

18   screen towards you so only you'll be able to watch

19   what's going on here; you and Mr. Bluestone.  And then

20   I'm going to ask you some questions to do what we call

21   authenticate these videos.  All right?  Because

22   evidence doesn't exist in a vacuum.  Somebody has to

23   tether it to the case.  Okay?

24      A.   Okay.

25      Q.   All right.  So I am going to --
```

```
 1       Q.   All right.  Same questions.  Is that from the
 2   evening in question?
 3       A.   Yes.
 4       Q.   And is that consistent with your memory of
 5   the events?
 6       A.   Yes.
 7       Q.   Okay.  Exhibit 5.
 8            (Video playing.)
 9   BY MR. SCHWAIGER:
10       Q.   All right.  Was that from that evening as
11   well?
12       A.   Yes.
13       Q.   Is that consistent with your memory of those
14   events?
15       A.   Yes.
16       Q.   All right.  And Exhibit 6.
17            (Video playing.)
18            THE WITNESS:  So I can authenticate that.
19            (Video playing.)
20   BY MR. SCHWAIGER:
21       Q.   Is that from the evening in question?
22       A.   Yes.
23       Q.   Is that consistent with your memory of those
24   events?
25       A.   Yes.
```

1    Q.    Some follow-up questions and then I'll be

2    done.

3           So it sounded like you were arguing with

4    Fernando because you couldn't find your phone, right?

5    A.    That was part of the argument, yes.  After I

6    had gone to the shower, my phone had disappeared.  And

7    so I wanted him to help me find it, because I thought

8    he had taken it and hid it somewhere.

9    Q.    Is there anything else, having heard that,

10   that you remember now about the evening in question

11   that you didn't when you were being asked questions

12   earlier in this deposition?

13          MR. BLUESTONE:  Objection.  Overbroad, vague

14   and ambiguous.

15   BY MR. SCHWAIGER:

16   Q.    Do you understand that question?

17   A.    It sounds like I was a little more drunk than

18   I thought, that I was angry; other than that, no.

19   Q.    You testified in direct examination that each

20   day you would hope for the best and hope it would be a

21   good day.

22   A.    Mm-hmm.

23   Q.    And that based on the abusive upbringing that

24   you had, you felt that you were -- you said there was

25   no way that this could be happening again to you; is

111

```
 1    that right?
 2         A.    Right.
 3         Q.    All right.  Would you qualify what you heard
 4    there as abuse?
 5         A.    Yes.  In reaction to abuse that I would --
 6    was receiving.
 7         Q.    So it was abuse that -- was it abuse that
 8    Fernando deserved?
 9              MR. BLUESTONE:  Objection.  Argumentative.
10    BY MR. SCHWAIGER:
11         Q.    Go ahead.
12         A.    It felt righteous to me.  I'm not saying that
13    anyone deserves abuse.  But at the state I was in at
14    that point, the things that had led up to that, I felt
15    justified in saying what I was saying.
16         Q.    And today, as you give testimony, do you
17    believe you were still justified in saying those things
18    the way that you said them to Fernando?
19         A.    Maybe not the way I said them, but -- and not
20    everything I said, but he did -- he's doing a good job
21    of ruining my life.
22         Q.    Now, you said earlier, when you called the
23    police on Fernando, it was because he was out of
24    control, right?
25         A.    Yes.
```

```
 1        Q.   And that he would not leave, right?
 2        A.   Yes.
 3        Q.   And that things were chaotic; is that right?
 4        A.   Yes, yes.
 5        Q.   And you didn't know how to deescalate the
 6   situation?
 7        A.   Yes.
 8        Q.   He was asking you to leave, right?
 9        A.   He was asking me to leave?
10        Q.   Yes.  On these --
11        A.   To leave the room.  That was my house.  That
12   was my roof.  He had no business being there.
13        Q.   Except that he was your husband, right?
14        A.   Yes.
15        Q.   Okay.  Did Fernando ever call the police on
16   you?
17        A.   No.
18        Q.   Even when you were behaving like that?
19        A.   No.
20        Q.   Do you think sometimes that's just how
21   marital relationships get?
22        A.   Not healthy ones.
23        Q.   I agree with you on that.
24             This isn't your lawsuit.
25        A.   No.
```

1          Q.   Do you want anything particular to happen in

2     this lawsuit?

3          A.   I would like to be left alone and never hear

4     anything about it for the rest of my life.  I want

5     nothing to do with this lawsuit.

6          Q.   Do you want Fernando to lose it?

7          A.   I don't care what happens.

8          Q.   Would you like to see bad things happen to

9     him?

10         A.   What kind of question is that?

11         Q.   That's a real question.  It goes to the bias

12    that you might have as a witness against Fernando.

13              Do you want to see bad things happen to him?

14         A.   No.  I'm indifferent.

15              MR. SCHWAIGER:  Okay.  Any follow-up?

16              MR. BLUESTONE:  I do have a follow-up

17    question.

18    FURTHER EXAMINATION BY MR. BLUESTONE:

19         Q.   At any time did you consent to Mr. Del Valle

20    videotaping you?

21         A.   No.

22         Q.   Did you ever consent to him disseminating

23    those videotapes to any third party?

24         A.   No.  Today's the first time I knew that these

25    videos even existed.

1          REPORTER'S CERTIFICATE

2      I, Kelly K. Lopez, a Certified Shorthand

3  Reporter, licensed in the State of California, License

4  No. 7785, hereby certify that before the taking

5  of the foregoing deposition, the witness was duly

6  sworn by me to testify to the truth, the whole truth,

7  and nothing but the truth in the above-entitled matter;

8  and that the foregoing is a full, true and correct

9  transcript of the proceedings had at the taking of said

10  deposition.

11

12      I further certify that I am not of counsel or

13  attorney for either or any of the parties in the

14  above-named cause, or in any way interested in the

15  outcome of said cause.

16

17      I hereby affix my signature this 2nd day of

18  November, 2018.

19

20          [ ] Reading and Signing was requested.

21          [X] Reading and Signing was not requested.

22

23

24          _____

25          KELLY K. LOPEZ

KELLY K. LOPEZ REPORTING * (707) 322-7757
KELLY@LOPEZREPORTING.COM